# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOIL RETENTION PRODUCTS, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>BRENTWOOD INDUSTRIES, INC., a Pennsylvania corporation; DOES 1-25, inclusive,<br><br>Defendant. | Case No.:  3:20-cv-02453-BEN-WVG<br><br>**ORDER:**<br><br>**(1) DENYING DEFENDANT'S MOTION TO DISMISS THE COMPLAINT PURSUANT TO RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE and**<br>**(2) DENYING DEFENDANT'S MOTION TO STRIKE**<br><br>**[ECF No. 11]** |

## I.   INTRODUCTION

Plaintiff SOIL RETENTION PRODUCTS, INC., a California corporation brings this action for, *inter alia*, breach of contract against Defendant BRENTWOOD INDUSTRIES, INC., a Pennsylvania corporation.  Before the Court is Defendant's Motion to Dismiss the First Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Motion to Strike prayer for attorney's fees pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.  The motions are denied.

## II.   BACKGROUND

### A.   Statement of Facts[1]

The background facts were described in this Court's prior order (dated February 23, 2021) and are referred to again here, as needed.  Plaintiff "manufactures plantable concrete systems, including Drivable Grass®, Verdura® and Enviroflex® systems."  FAC at 3,[2] ¶ 6.  Starting in 2006, Plaintiff engaged Defendant to help in the design and manufacturing of vacuum formed molds that Plaintiff would use in the manufacturing process.  *Id.* at 3, ¶ 7.  As time passed, Plaintiff sought to expand and streamline its manufacturing processes and distribution channels for its patented product by entering into licensing agreements with third parties to expand its territory throughout the United States.  FAC at 3, ¶ 8.  To accomplish this, Plaintiff needed modifications to its production molds and turned to Defendant.  *Id.*

In May 2018, Plaintiff and Defendant initiated discussions in which Plaintiff detailed its business plan and requested Defendant's assistance in modifying the molds so Plaintiff's plan could be executed.  FAC at 4, ¶ 9.  Plaintiff alleges that Defendant "understood [Plaintiff] was relying upon [Defendant] to timely deliver modified production molds."  *Id.* According to Plaintiff, these discussions transpired for several months until August 2018, when Plaintiff asked if Defendant could employ injection molding to create the molds.  *Id.* Plaintiff pleads that David Reinhart, Defendant's representative, advised Plaintiff that "the process would be too expensive (up to $350,000) and he was confident [Defendant] could accomplish [Plaintiff]'s goals using Thermoforming to create the molds."[3]  *Id.*

---

[1]    The majority of the facts set forth are taken from the operative complaint, and for purposes of ruling on Defendants' motion to dismiss, the Court assumes the truth of the allegations pled and liberally construes all allegations in favor of the non-moving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

[2]    Unless otherwise indicated, all page number references are to the ECF-generated page number contained in the header of each ECF-filed document.

[3]    Although tangential to the issues at hand, the Court notes that injection molding involves "hot liquid plastic [being] injected into a mold," while thermoforming involves a "heated plastic sheet pressed into a shape by a mold."  *E. Iowa Plastics, Inc. v. PI, Inc.*, 889 F.3d 454, 456 (8th Cir. 2018); *see also In re OxyContin Antitrust Litig.*, 965 F. Supp.

On September 7, 2018, Defendant sent Plaintiff a written quote to design and make modified molds.  FAC at 4, ¶ 10.  On September 19, 2018 and September 21, 2018, Defendant sent Plaintiff revised quotes.  *Id.*  By September 20, 2018, the parties had agreed upon terms for Defendant to create a sample mold, production mold, and related parts in exchange for Plaintiff's agreement to first pay Defendant $5,656.00 for the sample mold and related parts.  *Id.* at 4, ¶ 11.  Plaintiff alleges that Defendant represented to Plaintiff that: (1) the lead time for the sample molds would be five to six weeks from receiving the tooling order with an additional material lead time of three to four weeks; and (2) the sample mold would meet Plaintiff's requirements.  *Id.*

On September 24, 2018, Plaintiff sent Defendant a written purchase order memorializing the size of the sample mold, scope of the related parts, and price of the mold and parts ($5,656.90).  FAC at 4-5, ¶ 11; *see also* Exhibit "1" to FAC (attaching the September 24, 2018 Purchase Order).  On December 11, 2018, "[a]fter multiple, unexplained delays," Defendant forwarded Plaintiff the sample mold.  FAC at 4-5, ¶ 12.  In January 2019, textures were chosen for the sample mold, but it took Defendant until March 2019 to ship the modified sample molds.  *Id.*  Plaintiff alleges that "ultimately [Defendant] provided the sample mold to [Plaintiff]," and Plaintiff paid Defendant for doing so even though it did not meet Plaintiff's expectations.  FAC at 4-5, ¶ 11.

Plaintiff alleges that by April 2019, Defendant "committed to manufacturing the production mold and parts within 8-9 weeks."  FAC at 5, ¶ 13.  Accordingly, on April 29, 2019, Plaintiff issued another written purchase order to Defendant memorializing the scope of the production mold and payment terms: Plaintiff would pay Defendant $22,400.00 for

_____

2d 420, 436 (S.D.N.Y. 2013) ("'[T]hermoforming' encompasses formulations made by applying pressure with preceding or simultaneous application of heat."); *Conceptus, Inc. v. Hologic, Inc.*, 771 F. Supp. 2d 1164, 1176 (N.D. Cal. 2010) (noting that injection molding is a "process that involves a single injection of a liquid silicone rubber material into a mold that creates a unitary structure," and "[t]he shape of this molded structure is defined by a 'solid core through the center' and a 'porous architecture which surrounds the center core.'")

the production mold to be manufactured by Defendant using Thermoforming.  FAC at 5, ¶ 13.  Plaintiff alleges that it paid Defendant for the Thermoformed production mold, which Defendant provided, but Plaintiff claims also it did not meet its expectations.  *Id.*

In May 2019, the parties allegedly agreed on a price for the finalized molds.  FAC at 6, ¶ 14.  Plaintiff alleges that on May 9, 2019, it issued a written purchase order to Defendant, pursuant to which Defendant would manufacture 6,000 molds using Thermoforming for a total cost of $64,800.00.  FAC at 6, ¶ 14.  Plaintiff alleges that Defendant "never performed pursuant to this purchase order as the production molds fell below standard of care and did not meet the parties' expectations."  *Id.*

Plaintiff further pleads that in late June 2019, it received the production mold, and Nick Jannson, Plaintiff's representative, informed Defendant's representative, David Reinhart, that the features did not conform to the shop drawing approved by Plaintiff.  FAC at 6, ¶ 15.  Plaintiff alleges that the next month, in July 2019, Mr. Reinhart visited Plaintiff's manufacturing plant in Perris, California to deliver new samples and learn more about Plaintiff's needs.  *Id.*  Plaintiff alleges that at this time, it rejected the samples.  *Id.*

Plaintiff pleads that on August 14, 2019, "[f]ollowing more delays and excuses," it received the further modified materials and immediately reported problems to Defendant.  FAC at 6, ¶ 16.  Plaintiff alleges that around this same time, it learned Defendant was developing a product to compete with Plaintiff's Drivable Grass.  FAC at 6, ¶ 17.

In October 2019, "[f]ollowing additional discussions between the parties," Defendant sent Plaintiff more sample production molds, which Plaintiff approved for etching.  FAC at 6, ¶ 18.  In December 2019, Plaintiff received production molds, which Plaintiff alleges were: (1) received over a year after placing its order; and (2) of an inferior quality to the samples Plaintiff had approved because they crumbled easier than prior samples and could not be used for their intended purpose.  FAC at 6-7, ¶ 18.

In January 2020, Plaintiff placed another order with Defendant for vacuum formed molds.  FAC at 7, ¶ 19.  Plaintiff alleges it placed this order because it had no other options given the Thermoformed molds "could not be used for their intended purpose."  *Id.*

-4-

Accordingly, on January 7, 2020, Plaintiff issued a written purchase order to Defendant memorializing the type and size of the vacuum formed molds to be manufactured by Defendant, pursuant to which Plaintiff would pay Defendant $35,560.00 for 3,500 vacuum formed molds.  FAC at 7, ¶ 20; *see also* Exhibit "4" to FAC, ECF No. 10-4 at 2.

In February 2020, Plaintiff received the molds it had ordered pursuant to the fourth purchase order but alleges they were inferior or weaker than the previous molds.  FAC at 7, ¶ 21.  Plaintiff alleges that prior to hiring Defendant to make the Thermoforming molds, it had relied upon and used Defendant's vacuum formed molds.  *Id.*  However, Plaintiff alleges that the vacuum formed molds Defendant provided in February 2020 were inferior (weaker) than the vacuum formed molds Defendant had been providing since 2006.  *Id.* Plaintiff alleges that "[t]his doubled the amount of time required to manufacture [its] products, which has added to [its] damages through increased production costs and additional manufacturing delays."  FAC at 8, ¶ 21.  Plaintiff also alleges that because the vacuum formed molds could not be used for their intended function and purpose, Plaintiff was excused from performing under the Vacuum Form Contract.  FAC at 8, ¶ 21.

Plaintiff claims it has sustained over $1.4 million in unspecified damages.  FAC at 11, ¶ 41.  Plaintiff now alleges two separate breach of contract claims, arising out of the four purchase orders.  These purchase orders are summarized below:

| Purchase Order No. | Order Date: | Product: | Amount: |
| --- | --- | --- | --- |
| P-11670 | September 24, 2018 | **Sample Mold**<br>• 3x Concrete Form Mold Sample Parts (Starting Gauge – 10.0 at $198.19 per unit)<br>• 2x2 Molds Drivable Grass (3x3 Sample Aluminum Mold – 1.0 at $3,675.00 per unit) | $5,656.90 |
| P-11694 | April 29, 2019 | **Production Mold**<br>2x2 Molds Drivable Grass – Production Tooling Pricing | $22,400.00 |

-5-

| | | (1.00 at $22,400.00 per unit) | |
|---|---|---|---|
| P-11697 | May 9, 2019 | **Final Production Molds** <br> 2x2 Concrete Form Molds Drivable Grass (6,000 at $10.80 per unit) | $64,800.00 |
| P-11721 | January 7, 2020 | 2x2 Concrete Form Molds Drivable Grass (3,500 at $10.16 per unit) | $35,560.00 |
| **TOTAL:** | | | **$128,416.90** |

*See* Exhibits "1" through "4" to FAC, ECF Nos. 10-1 at 2, 10-2 at 2, 10-3 at 2, 10-4 at 2.

### B. Procedural History

On May 26, 2020, Plaintiff filed this action against Defendant in the San Diego Superior Court, alleging nine claims for relief for: (1) breach of contract; (2) fraud; (3) negligent misrepresentation; (4) unfair business practices in violation of California Business and Professions Code, section 17200 *et seq.*, (the "UCL"); (5) breach of covenant of good faith and fair dealing; (6) intentional interference with contractual relations; (7) negligent interference with prospective economic relations; (8) intentional interference with prospective economic relations; and (9) misappropriation of trade secrets. The case was then removed to this Court on the basis of diversity jurisdiction.

Defendant filed a motion to dismiss, which the Court granted in part. Plaintiff timely filed its amended complaint, which now alleges three claims for relief: (1) breach of contract (Thermoformed Molds); (2) breach of contract (Vacuum Formed Molds); and (3) misappropriation of trade secrets.

## III. LEGAL STANDARD

### A. Motion to Dismiss

#### 1. *Claims for Breach of Contract*

A claim for relief for breach of contract under California law must show: (1) a legally enforceable contract between the parties; (2) the defendant's breach of that contract; and (3) damage to the plaintiff caused by the defendant's breach. *Hickcox-Huffman v. US Airways, Inc.*, 855 F.3d 1057, 1062 (9th Cir. 2017); *McKell v. Wash. Mut., Inc.,* 142 Cal. App. 4th 1457, 1489, 49 Cal. Rptr. 3d 227 (2006). In federal court, a plaintiff need not

-6-

plead the contract terms with unusual specificity.  All that is required is "a short and plain statement of the claim showing that the pleader is entitled to relief."  *See* Rule 8(a)(2) of the Federal Rules of Civil Procedure.  Allegations that meet the notice-pleading standards of Rule 8 will suffice.  *See, e.g., James River Ins. Co. v. DCMI, Inc.,* 2012 U.S. Dist. LEXIS 96808, 2012 WL 2873763, *3 (N.D. Cal. July 12, 2012).  In other words, it is not necessary for a plaintiff to allege the terms of an alleged contract with precision if the Court is able generally to discern at least what material obligation of the contract the defendant allegedly breached.  *Langan v. United Servs. Auto. Ass'n,* 69 F. Supp. 3d 965, 2014 WL 4744790, *7 (N.D. Cal. 2014); *see also Sierra View Local Health Care Dist. v. Influence Health, Inc.*, 2016 U.S. Dist. LEXIS 59502, 2016 WL 2346799, *5 (E.D. Cal. May 4, 2016) (holding that fairly rudimentary contract allegations satisfy Rule 8).

In the Court's previous order, Plaintiff failed to plead facts showing what its performance entailed, when Defendant performed, whether Plaintiff accepted the performance, and whether that performance complied with the relevant provisions of the California Commercial Code governing payment and acceptance or rejection of the allegedly non-conforming goods."  Order, ECF No. 9 at 19.  In the amended complaint, Plaintiff has made sufficient allegations to satisfy the earlier shortcomings.

Plaintiff also attached purchase orders that are alleged to reflect the contracts as exhibits to the amended complaint.  The documents attached to the amended complaint are not fully executed contracts but rather unsigned purchase orders of the type merchants might exchange over a long course of dealing.  "A contract for sale of goods may be made in any manner sufficient to show agreement, *including conduct by both parties which recognizes the existence of such a contract*."  Cal. Comm. Code § 2204(1) (emphasis added); *see also Norcia v. Samsung Telecommunications Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017).  "An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined."  Cal. Comm. Code § 2201(2).  Further, "[e]ven though one or more terms are left open a contract for sale does not fail for indefiniteness if [1] *the parties have intended to make a contract* and [2] *there is a*

*reasonably certain basis for giving an appropriate remedy*." *Id.* at § 2204(3) (emphasis added). California Commercial Code provisions incorporate general common law provisions on contract formation. Under common law, a contract is formed when there are: (1) parties capable of contracting; (2) mutual consent; (3) a lawful object; and (4) sufficient cause or consideration." *Grimes v. New Century Mortg. Corp.*, 340 F.3d 1007, 1011 (9th Cir. 2003) (McKeown, J., dissenting) (citing CAL. CIV. CODE § 1550).

Neither party argues that the parties were incapable of contracting, that the alleged contract involved an unlawful object, or that the contract lacked sufficient consideration. As such, the Court again finds that these elements are not at issue. Whether there was mutual consent will be a fact question. Here, Defendant disputes agreeing to the terms and contends a valid contract never came into existence. Defendant may ultimately prove correct, but it is a matter for summary judgment or trial. Likewise, at trial Plaintiff will have to prove agreement by both parties. For purposes of Rule 8, however, the allegations are sufficient. "The parties may well argue at a later stage of litigation that the intent of the parties or properly admitted extrinsic evidence supports their respective interpretations of the contract. Such factually based arguments are appropriate . . . at a later stage of litigation, not on the pleadings." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 976 (9th Cir. 2010). This is also the case if the contract is silent as to the time for delivery. "The time for shipment or delivery or any other action under a contract if not provided in this division or agreed upon shall be a reasonable time." CAL. COM. CODE § 2309(1); *see also Apex LLC v. Sharing World, Inc.*, 206 Cal. App. 4th 999, 1011 (2012) ("California Uniform Commercial Code sections 2308, 2309, 2503, subdivision (1), and 2504 are the gap fillers for place of delivery and manner of tender."). Whether the time for delivery is reasonable "is usually a question of fact." *Aronowicz v. Nalley's, Inc*., 30 Cal. App. 3d 27, 52-53 (1972). Thus, the alleged contracted delivery time will be the subject of fact finding for the jury and need not be alleged with precision in a complaint.

Plaintiff alleges that the sample mold met Plaintiff's requirements. Plaintiff does not need to plead what those precise requirements were at the complaint stage of the

litigation. Plaintiff alleges that the parties' agreement "was followed by [Plaintiff]'s written purchase order to [Defendant] on September 24, 2018 "memorializing the size of the sample mold, scope of the related parts and the price of the mold and parts." FAC at 4-5, ¶ 11 (attaching and incorporating by reference a copy of the September 24, 2018 purchase order as Exhibit "1"). With respect to Purchase Order No. 2, Plaintiff alleges that "[b]y April 2019, [Defendant] committed to manufacturing the production mold and parts within 8-9 weeks." FAC at 5, ¶ 13. Plaintiff alleges that this agreement was confirmed in writing by virtue of Plaintiff sending "a written purchase order to [Defendant] memorializing the scope of the production mold and payment terms," pursuant to which Plaintiff would pay Defendant $22,400.00 for the production mold to be manufactured by Defendant using Thermoforming. *Id.* Again, the actual purchase order contains no terms assuring delivery would be made by a specific time, and in fact, expressly states under a section entitled "Terms," that there are "NO TERMS." *See* ECF No. 10-2 at 2. However, the delivery term may be proven to be whatever a reasonable time entails. Plaintiff alleges that Defendant "accepted the terms of the parties' agreement as memorialized in Exhibit '2.'" FAC at 5, ¶ 13. Further, Plaintiff alleges the production molds "did not meet [Plaintiff]'s expectations or the representations made by [Defendant]." As a result, Plaintiff has pleaded sufficient facts to plausibly establish mutual assent.

As to Purchase Order No. 3, Plaintiff alleges that "[i]n an effort to avoid further delays, the parties agreed on a price for the finalized molds and [Plaintiff] issued a written purchase order to [Defendant] on May 9, 2019 for 6,000 molds to be manufactured by [Defendant] using Thermoforming at a cost of $64,800.00." FAC at 6, ¶ 14. Paragraph 14 of the FAC describes Purchase Order No. 3 as a contract for "finalized molds." *Id.* at 6, ¶ 14. For Purchase Order No. 4, Plaintiff alleges that in January 2020, it placed an order for vacuum formed molds. FAC at 7, ¶ 19. The FAC pleads that on January 7, 2020, Plaintiff issued a written purchase order to Defendant "memorializing the type and size of the vacuum form molds to be manufactured by [Defendant]," pursuant to which Plaintiff would pay Defendant $45,560.00 for 3,500 vacuum formed molds. *Id.* at 7, ¶ 20. Plaintiff alleges

that "[t]he terms and conditions in Paragraph 18 [of the FAC], and as memorialized in Exhibit '4,' are referred to herein as the 'Vacuum Form Contract.'" *Id.* Plaintiff alleges generally that Defendant "accepted the terms as memorialized in Exhibit '4,' and provided [Plaintiff] with the vacuum formed molds." *Id.* at 7, ¶ 20.

As to all four purchase orders, while Plaintiff does not allege the specifics of when or how Defendant accepted the purchase orders, it need only give fair notice of the claim. Each purchase order shows an order date, and a "Required Date." Under Ship Via, Purchase Order Nos. 1 and 3 indicate "Best Way," (Purchase Order Nos. 2 and 4 are blank). Under "Terms," Purchase Order Nos. 1, 3, and 4 state "Net 30 days," while Purchase Order No. 2 states "NO TERMS." All four purchase orders state, "F.O.B." *See* ECF Nos. 10-1 at 2, 10-2 at 2, 10-3 at 2, and 10-4 at 2.

Defendant repeatedly points out that: (1) all four purchase orders are unsigned; (2) Plaintiff has provided no proof that Defendant consented to the purchase orders Plaintiff prepared; and (3) absent a signed writing, Plaintiff cannot overcome the Statute of Frauds. *See* Mot. at 15:25-26. Ultimately, if Plaintiff cannot prove at trial that Defendant accepted the purchase orders, then Defendant will prevail. However, proof is a matter for trial rand is not required to meet Rule 8(a)(2)'s short and plain statement pleading standard. *Whittlestone*, 618 F.3d at 976.

Defendant notes that § 2201 of the California Commercial Code requires contracts for the sale of goods "for the price of $500 or more," such as the four purchase orders in this case, to be in writing and signed in order to be enforceable. CAL. COMM. CODE 2201(1). *See* CAL. COMM. CODE § 1201(b)(37). While neither party signed any of the purchase orders, there are four exceptions to the Statute of Frauds signing requirement (these are: the written confirmation rule, the specially manufactured goods exception, the admission in judicial proceedings exception, and the goods accepted or payments made exception). CAL. COMM. CODE § 2201(2)-(3). The written confirmation exception is satisfied if made: (1) between merchants; (2) one merchant within a reasonable time sends "a writing in confirmation of the contract and sufficient against the sender"; and (3) that

-10-

3:20-cv-02453-BEN-WVG

writing is received by the other party who "has reason to know its contents" and fails to send a written notice of objection to the writing's contents within ten days of receiving it. CAL. COMM. CODE § 2201(2).

As applies to this case, that absence of signatures from the purchase orders does not require dismissal for failure to state a claim for relief. The allegations plead a plausible exception to the signing requirement. It may be shown at trial, for example, that Plaintiff prepared the purchase orders (as Plaintiff alleges it did), sent them to Defendant, and Defendant failed to object within ten days of receipt, in which case the purchase orders could be enforced against Defendant, assuming it met the other requirements of a valid contract. Here, Plaintiff clarified since the Court's previous dismissal that Plaintiff sent the purchase orders to Defendant. And each purchase order states, "Confirm To: David Reinhart." Thus it is plausible that parties' conduct satisfies an exception for the Statute of Frauds signing requirement.

Furthermore, under the second exception to the Statute of Frauds, a contract that fails to meet the requirements will be upheld if: (1) "the goods are to be specially manufactured for the buyer"; (2) "are not suitable for sale to others in the ordinary course of the seller's business"; and (3) the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement." CAL. COMM. CODE § 2201(3)(a). In this case, the allegations plausibly claim that the molds "are not suitable for sale to others in the ordinary course of the seller's business." *Id.*

Plaintiff also argues the purchase orders overcome any Statute of Frauds issue due to the exception for "goods for which payment has been made and accepted or which have been received and accepted (Section 2606)." CAL. COMM. CODE § 2201(c); *see also* Oppo. at 10:5-6 (arguing that "the statute of frauds exception under California Commercial Code section 2201(c) is met"). Plaintiff argues that, rather than rejecting Plaintiff's purchase orders or payments, instead, Defendant accepted the purchase orders as confirmed by its shipment of molds. Oppo. at 9:20-21 (citing FAC at 4-5., ¶¶ 11, 13). Plaintiff contends

-11-

that this satisfies the "statute of frauds exception under California Commercial Code section 2201(c)." *Id.* at 10:5-6. While bare claims are insufficient for prevailing at trial, Plaintiff's allegations are plausible and enough to satisfy Rule 8 and avoid dismissal for failure to state a claim.

In the Court's previous order, it also explained that "Plaintiff fails to plead facts showing what its performance entailed, when Plaintiff performed, whether Defendant accepted the performance, and whether that performance complied with the relevant provisions of the California Commercial Code governing payment and acceptance or rejection of the allegedly non-conforming goods." Order, ECF No. 9 at 19. The newly amended complaint now alleges Plaintiff "performed all conditions, covenants and promises required by it to be performed in accordance with the terms and conditions of the . . . Contract, except to the extent that [Plaintiff] was prevented or excused from performing by agreement, action or by the breach of [Defendant]." FAC at 10-11, ¶ 39, 11-12, ¶ 46.

The Court notes that in the typical injection molding process, inexpensive sample molds are manufactured first. *See Sec. & Exch. Comm'n v. Revolutions Med. Corp.*, No. 1:12-CV-3298-LMM, 2015 WL 11199068, at *1 (N.D. Ga. Apr. 3, 2015). "[O]nce product from those [test/sample] molds is functional, the manufacturer then produces expensive … volume production molds." *Id.* Thus, sample molds are "used to make production molds." *See Mode Art Jewelers Co. v. Expansion Jewelry, Ltd.*, No. 75 CIV. 519, 1977 WL 22762, at *2 (S.D.N.Y. Nov. 30, 1977) (noting that "the sample molds [were] in turn …used to make production molds"). "Following the final molds' production and the product passing final testing and approvals, mass production can then begin." *Revolutions Med.*, 2015 WL 11199068, at *1; *see also Mode Art Jewelers Co. v. Expansion Jewelry, Ltd.*, No. 75 CIV. 519, 1977 WL 22762, at *2 (S.D.N.Y. Nov. 30, 1977) (noting that in that case, "production molds, which may produce as little as fifty sets of molded parts or as many as three hundred sets, are destroyed after they lose their usefulness as production tools"). As a result, the Court finds that although Plaintiff could be clearer in pleading whether it accepted, rejected, or revoked any of the molds, a plausible inference is that Plaintiff

accepted the sample molds in order to continue with ordering production molds. Thus, the allegations give rise to a plausible inference that Defendant attempted to deliver goods under Purchase Order No. 1.[4]

If Plaintiff rejected the goods, it would be required to prove at trial that the rejection was communicated within a reasonable time.[5] If some of the deliveries were Defendant's attempt to cure, and they still failed to conform, Plaintiff would be able to revoke acceptance if the nonconformity "substantially impair[ed]" the value of the goods. CAL. COM. CODE § 2608(1); *see also Ramos v. Mercedes-Benz USA, LLC*, 55 Cal. App. 5th 220, 228 (2020), *as modified* (Oct. 1, 2020) (affirming the judgment of the trial court that damages caused by a delay in repairing a nonconformity that did *not* substantially impair the car's use, value, or safety). These matters require proof at trial. However, they need not be pleaded with specificity at the pleading stage. *Whittlestone*, 618 F.3d at 976.

With respect to Purchase Order No. 2, Plaintiff alleges that "[b]y April 2019, [Defendant] committed to manufacturing the production mold and parts within 8-9 weeks." FAC at 5, ¶ 13. Plaintiff pleads the production molds were received in late June 2019, or within 8-9 weeks. FAC at 6, ¶ 15. Plaintiff pleads that in July 2019, Mr. Reinhart visited Plaintiff's manufacturing plant to deliver new samples. FAC at 6, ¶ 15. It is plausible that new "sample production molds" would be in response to Plaintiff's rejection of production molds in June 2019, with Defendant exercising a right to cure by delivering new "sample production molds" in July 2019. FAC at 6, ¶ 15. Paragraph 14 references Plaintiff

---

[4]  To the extent the goods were nonconforming, a merchant has the option of rejecting them, revoking acceptance, or exercising the right to cure. "Where any tender or delivery by the seller is rejected because nonconforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery." CAL. COM. CODE § 2508(1).

[5]  A buyer seeking to reject goods or pursue damages for breach of warranty must provide notice that the goods are non-conforming within a reasonable time. *See, e.g.*, CAL. COM. CODE § 2602(1) (providing that "[r]ejection of goods must be within a reasonable time after their delivery or tender" and "is ineffective unless the buyer seasonably notifies the seller").

-13-

receiving "further modified materials on August 14, 2019 and immediately report[ing] problems to [Defendant]." *Id.* at 6, ¶ 16. Paragraph 18 states that Defendant sent Plaintiff "more sample production molds in October 2019, and [Plaintiff] approved the master mold for etching." *Id.* at 6, ¶ 18. The allegations suggest that Defendant was exercising its right to cure a nonconforming delivery of production molds. *Id.* More importantly, it plausibly alleges a contract between the parties existed. Plaintiff alleges that in December 2019, it finally received "production molds," pleading they were received "over a year after placing [the] order on September 24, 2018." FAC at 6-7, ¶ 18. Plaintiff alleges the production molds "did not meet [Plaintiff]'s expectations or the representations made by [Defendant]." FAC at 6, ¶ 15. Plaintiff pleads that the molds "were of inferior quality to the samples [Plaintiff] had approved, crumbled easier than prior samples, and could not be used by [Plaintiff] for their intended purpose." *Id.* at 7, ¶ 18. Finally, Purchase Order No. 2 references the following specific terms:

> PRODUCTION TOOLING PRICING: 2-UP Aluminum Positive Billet Machined Mold
> 460 REN Plug nested in P/Box
> Steel Pressure Box
> Textured w/ CE-742 (after mold has been approved)
> Production Tooling Terms: 50% down, 50% due NET 30

*See* ECF No. 10-2 at 2. As such, it plainly appears Plaintiff has adequately alleged a course of dealing between Plaintiff and Defendant over an arrangement to produce molds. Ultimately, the Court concludes that the amended complaint sufficiently alleges facts to support a breach of contract claim for relief.

For Purchase Order No. 4 which is said to reflect the second contract, Plaintiff alleges that in January 2020, it placed another order with Defendant for vacuum formed molds. FAC at 7, ¶ 19. The amended complaint pleads that on January 7, 2020, Plaintiff issued a written purchase order to Defendant "memorializing the type and size of the vacuum form molds to be manufactured by [Defendant]," pursuant to which Plaintiff would pay Defendant $45,560.00 for 3,500 vacuum formed molds. *Id.* at 7, ¶ 20. Purchase Order No. 4 provides the specific requirements that the 2x2 drivable grass molds would be "2' x

-14-

2' concrete form, Brentwood Part # ACHG18073." ECF No. 10-4 at 2. However, Plaintiff alleges that "the vacuum formed molds Brentwood delivered in February 2020 were *inferior* (*i.e.*, compromised and weaker) than the multiple vacuum formed molds Defendant had delivered to Plaintiff since 2006. *Id.* at 7, ¶ 21. Plaintiff also now alleges that "[b]ecause the vacuum formed molds could not be used for their intended function and purpose, [Plaintiff] was excused from performing under the Vacuum Form Contract." *Id.* at 8, ¶ 21. Plaintiff, alleges four times that various goods failed their intended purpose, *see id.* at 7, ¶ 18, ¶ 19, 8, ¶ 21. Upon review, Plaintiff has alleged sufficient facts to plausibly claim a contract existed and was breached in that Defendant did not deliver goods conforming to the purchase orders.

Defendant argues that "[t]he FAC makes clear that with the exception of the purported non-conformance that Defendant cured, Plaintiff accepted each shipment under the purchase orders." Mot. at 18:1-2. Thus, "[t]hat the goods did not meet Plaintiff's subjective standards is immaterial not only [because] such terms were not included in any agreement, but also under the provisions of the Commercial Code." *Id.* at 18:2-4. Defendant contends that "[o]nce the goods were accepted, Plaintiff became obligated to pay the contract rate for the goods accepted and could no longer reject the goods." *Id.* at 4-7 (citing CAL. COMM. CODE § 2607(1) and (2)). Defendant may well ultimately prove all of this at trial, but it is not a basis for dismissal for failure to state a claim.

The Court's previous order advised that Plaintiff had insufficiently pleaded damages. In the amended complaint, Plaintiff alleges that "[a]s a direct and proximate result of [Defendant]'s breach of the Thermoform Contract, [Plaintiff] has been damages in a sum which is which is currently unascertainable, but is no less than $1.4 million." FAC at 11, ¶ 41. Plaintiff also pleads that "[a]s a direct and proximate result of [Defendant]'s breach of the Vacuum Form Contract, [Plaintiff] has been damages in a sum which is … no less than $1.4 million." *Id.* Plaintiff explains that "[i]n addition to the monies paid to [Defendant] for molds that could not be used, the inability to provide [Plaintiff] with a mold it could use increased [Plaintiff]'s production costs and injected delays into its

-15-

manufacturing processes."  Oppo. at 9:11-13 (citing FAC at ¶ 21).  It elaborates that Defendant's "failure to deliver a useable mold negatively impacted [Plaintiff]'s business plan, disrupted [Plaintiff]'s relationships and contracts with its partners and licensees, and resulted in lost sales." *Id.* at 9:13-16 (citing FAC at ¶¶ 27, 32).  Finally, Plaintiff says that it "also incurred costs due to its contracting with another company to manufacture the molds." *Id.* at 9:16-18 (citing FAC at ¶ 34).

Here, the amended complaint alleges that "left with no other choices and in an effort to mitigate its damages and mounting financial losses, [Plaintiff] placed an order with [Defendant] for *vacuum formed* molds in January 2020 since the Thermoformed molds manufactured by [Defendant] could not be used for their intended purpose."  FAC at 7, ¶ 19.  Plaintiff also alleges that it "immediately reported problems" to Defendant with respect to "further modified materials" received on August 14, 2019.  FAC at 6, ¶ 16.  Plaintiff also alleges that it "has incurred substantial costs mitigating its losses by engaging another company to manufacture its molds, costs which [Plaintiff] seeks to recover from [Defendant]." *Id.* at 10, ¶ 34.  Plaintiff alleges that Defendant's breach of contract "doubled the amount of time required to manufacture [Plaintiff]'s products, which has added to [Plaintiff]'s damages through increased production costs and additional manufacturing delays."  FAC at 7-8, ¶ 21.  The amended complaint alleges that Plaintiff sustained "lost sales and loss of business goodwill" along with "lost profits, lost sales, and lost opportunity costs."  FAC at 9-10, ¶¶ 27, 34.  "Lost profits have been recoverable as damages in numerous similar cases involving breach of warranty" and breach of a contract. *Serian Bros., Inc. v. Agri-Sun Nursery*, 25 Cal. App. 4th 306, 326 (1994) (reversing the trial court's decision granting nonsuit as to claims for which the plaintiff could recover lost profits because the plaintiff-buyer could recover such damages for its claims for, *inter alia*, breach of contract and breach of warranty).

As mentioned earlier, a plaintiff need not plead contract damages with unusual specificity.  To survive a Rule 12(b)(6) motion to dismiss, allegations that meet the notice-pleading standards of Rule 8(a)(2) will suffice. *Grouse River Outfitters Ltd v. NetSuite,*

-16-

*Inc.*, No. 16-cv-02954-LB, 2016 U.S. Dist. LEXIS 141478, at *30-32 (N.D. Cal. Oct. 12, 2016) (citing *James River Ins. Co. v. DCMI, Inc.*, 2012 U.S. Dist. LEXIS 96808, 2012 WL 2873763, *3 (N.D. Cal. July 12, 2012)). Fairly rudimentary contract allegations satisfy Rule 8. *Sierra View Local Health Care Dist. v. Influence Health, Inc.*, 2016 U.S. Dist. LEXIS 59502, 2016 WL 2346799, *5 (E.D. Cal. May 4, 2016). The plaintiff has done enough to satisfy Rule 8's short, plain, statement of the claim requirement.

### 2. *Misappropriation of Trade Secrets*

To plead a claim for misappropriation of trade secrets, a plaintiff must allege both the existence of a trade secret and subsequent misappropriation of that trade secret. *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012). Plaintiff's new allegations plead sufficient facts to support a plausible claim for the existence of a trade secret and its misappropriation.

Plaintiff's amended complaint alleges that it owned patents and related proprietary information associated with SRP's Drivable Grass and the "information and details surrounding the design and manufacture of Drivable Grass® was, and is, a trade secret which was shared with Brentwood solely for the purpose of creating molds SRP could use in its manufacturing process and to implement its business plan." FAC at 12, ¶1. Plaintiff adds that it "was and is the owner of the design, specification and manufacturing of its Drivable Grass® product, a product which [it] invested significant time and resources inventing" and "protected this information as a trade secret." FAC at 12-13, ¶ 51. Thus, Plaintiff pleads the existence of and the subject of the alleged trade secret (*e.g.*, Drivable Grass). Plaintiff's amended complaint alleges that Defendant knew or should have known the information was a trade secret and if used or disclosed it would damage Plaintiff. It also alleges that Defendant improperly used or disclosed the trade secrets. FAC at 13, ¶ 52. To these allegations, Plaintiff adds that Defendant, "during the time period at issue, . . . began developing a product to compete with [Plaintiff]'s Drivable Grass®" and "improperly used and/or disclosed [Plaintiff]'s trade secrets regarding the design, specifications, manufacturing and production of [Plaintiff]'s Drivable Grass® . . . to

improperly and unfairly compete with [Plaintiff]."  FAC at 13, ¶ 52.  Such opportunistic competition in business dealings, unfortunately, is not rare and adds plausibility to Plaintiff's claim for relief.  While Plaintiff's claim for misappropriation of trade secrets is economical with specific facts, it sufficiently states a plausible claim for relief.  Thus, the Court denies Defendant's Motion to Dismiss.

### B.  Motion to Strike

Defendant moves to strike the damages claim for attorney's fees.  Motions to strike are generally disfavored.  Motions to strike claims for damages are not allowed at all.  The Ninth Circuit has held that, as a matter of law, Rule 12(f) of the Federal Rules of Civil Procedure does not authorize district courts to strike claims for damages.  *Whittlestone,* 618 F.3d at 976; *McKenzie v. Wells Fargo Bank, N.A.*, 931 F. Supp. 2d 1028, 1041 (N.D. Cal. 2013).  Moreover, the entitlement to attorneys' fees is customarily decided at the conclusion of proceedings rather than the start of proceedings.  Therefore, the motion to strike is denied.

## IV.   CONCLUSION

For the above reasons, the Court **ORDERS** as follows:

1.      Defendant's Motion to Dismiss the Complaint is DENIED.

2.      Defendant's Motion to Strike is DENIED**.**

3.      Defendant shall file its Answer within 10 days.

4.      The parties shall promptly jointly report to the assigned Magistrate Judge for an immediate scheduling order.

**IT IS SO ORDERED.**

DATED:    January  27, 2022

**HON. ROGER T. BENITEZ**
United States District Judge